**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**PHILLIP R. HATHEWAY**,

       Plaintiff,

vs.                                   No. **CIV 00-1200 MCA/RLP**

**JOHN P. THIES, RAY DEFRATES,
SHANNON McGUIRE, THOMAS
GARDUNO, PETER HACKET,
ERIC JORDAN, ERIC LEVELING,
DANIEL CAFFERKEY,** and
**MATTHEW MORALES**, in their
individual capacities, and the
**CITY OF ALBUQUERQUE**,

       Defendants.

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary

Judgment Against Defendants Thies, McGuire, and Garduno [Doc. No. 41] filed on July 6,

2001, Defendants' Cross-Motion for Partial Summary Judgment [Doc. No. 53] filed on July

30, 2001, and Plaintiff's Motion to Strike Defendants' Cross-Motion for Summary Judgment

[Doc. No. 57], filed on August 27, 2001.  Having reviewed the pleadings, memoranda, and

exhibits of record, the relevant law, and otherwise being fully advised in the premises, the

Court concludes that Defendants Thies, McGuire, and Garduno are entitled to summary

judgment with respect to all of Plaintiff's claims arising from the initial encounter and

investigative detention at Plaintiff's home on or about the evening of December 11, 1999. With respect to the subsequent detention of Plaintiff at the Albuquerque Police Department's substation, however, the Court concludes that Plaintiff is entitled to summary judgment against Defendants Thies and McGuire regarding their liability under 42 U.S.C. § 1983 for violating the Fourth Amendment and their liability under N.M. Stat. Ann. § 41-4-12 for the torts of false arrest and false imprisonment. Accordingly, the Court grants Defendants' cross-motion in part as to Plaintiff's claims arising from the events at his home and grants Plaintiff's partial summary-judgment motion in part as to the liability of Defendants Thies and McGuire arising from the events at the substation.

The Court further finds that Plaintiff's motion to strike is not well taken, and that motion is denied. Defendants are ordered to file an answer to Plaintiff's amended complaint within fourteen (14) calendar days after this Memorandum Opinion and Order is entered. The parties are granted leave to file dispositive motions regarding the remaining Defendants in this case within thirty (30) days after this Memorandum Opinion and Order is entered.

## I.  **BACKGROUND**

Plaintiff's Amended Complaint for Civil Rights Violations, Tort Claims, and Damages filed on March 28, 2001, alleges that on or about the evening of December 11, 1999, several law enforcement officers employed by the Albuquerque Police Department (APD) subjected Plaintiff Phillip R. Hatheway to an unlawful arrest, search, interrogation, and excessive use of force. According to the amended complaint, several law enforcement officers also intentionally assaulted, battered, falsely arrested, and falsely imprisoned Plaintiff and

trespassed on his residence and vehicle. The amended complaint further alleges that the City of Albuquerque is vicariously liable for the intentional torts of its employees. Defendants admit that Plaintiff was never charged with any crime arising from the events which occurred on or about December 11, 1999, but deny that any law enforcement officers violated Plaintiff's civil rights or committed any torts against him.

From the parties' cross-motions for summary judgment, it is possible to glean the following undisputed facts. Sometime between 3:00 and 3:30 p.m. on December 11, 1999, a "Subway" restaurant located at 333 Montano Boulevard in Albuquerque was robbed. APD Officer Burke (who is not a defendant in this case) was dispatched in reference to the robbery and made an incident report which included the statements of two witnesses. In addition, Officer Burke obtained a videotape that recorded the robbery from the vantage point of a security camera in the restaurant.

The first witness statement described the robber as a male twenty-five to thirty years old and five feet and eight inches tall with brown hair and a light complexion who weighed 160 pounds and had a small tattoo behind the thumb of his right hand. According to the first witness, the robber said: "I want the money. I have a gun. I don't want to hurt anyone. I have friends in the car."

The second witness statement described the robber as a Hispanic male forty years old and around five feet five inches tall with black hair and a dark complexion who weighed 120 pounds. According to the second witness, the cashier yelled for him to get a description of the car and man who she said had robbed her, so he ran out to see the man's car, got the

license number, and went back in. The second witness identified the license-plate number for the car and described it as a dented 1980's red Mazda two-door sports car with tinted windows.

Defendants Thies and McGuire were detectives assigned to APD's violent crimes unit on December 11, 1999. APD officers assigned to the North Valley area were looking for the car used in the robbery at that time. Defendant McGuire heard a call over the police radio regarding the robbery in question and an attempt to locate a Mazda RX-7 with a particular license plate that had been seen headed northbound on Second Street.

At approximately 4:00 p.m. on the date of the robbery, Defendants Thies and McGuire reviewed a portion of Officer Burke's incident report and watched the videotape taken from the security camera at the restaurant. The videotape itself is not part of the record at this point.

The parties disagree about the extent to which Plaintiff's physical characteristics are similar to the description provided in Officer Burke's report and the videotape. According to Defendant Thies, Plaintiff is "about five seven, five eight[,] . . . probably 150 pounds, [and] kind of skinny," with "kind of brown, light brown" hair. (Thies Dep. at 77.) In his deposition on June 5, 2001, Plaintiff testified that he "just turned 64," is "[a]bout 5' 6" and a half with [his] boots on," and weighs "[a]bout 120, soaking wet." (Hatheway Dep. at 10.)

Defendant Thies stated in his deposition testimony that the description of the robber was "close" or "similar" to Plaintiff, (Thies. Dep. at 84-85, 94), but he also acknowledged that the videotape was "not a real good picture" (id. at 21) and that there were differences

between Plaintiff and the description with respect to such characteristics as age and the presence of a tattoo (id. at 85). During the course of their investigation on December 11, 1999, neither Defendant Thies nor Defendant McGuire actually interviewed the individuals who provided the witness statements included in Officer Burke's report or asked them to identify Plaintiff from a line-up.

Defendants did learn, however, that the license-plate number identified in the witness statements collected by Officer Burke corresponded to a vehicle that was registered to Plaintiff, and that vehicle was a red RX-7. Defendants Thies and McGuire obtained three possible addresses for Plaintiff through records of the Motor Vehicle Division. At approximately 8:30 p.m. on December 11, 1999, Defendants Thies and McGuire obtained Plaintiff's actual address from Plaintiff's daughter and son-in-law, whom they found at one of the possible addresses identified in the motor-vehicle records.

In his deposition, Defendant Thies testified that during his conversation with Plaintiff's daughter and son-in-law that evening, they confirmed that Plaintiff owned two red RX-7's. According to Defendant Thies, Plaintiff's daughter further indicated that Plaintiff "hangs around with a bunch of knuckleheads" and that "it wouldn't surprise" her if those "knuckleheads" borrowed Plaintiff's vehicle to carry out a robbery. (Thies Dep. at 21-22.)

Defendants Thies and McGuire proceeded to drive to the trailer park where Plaintiff resided; at that location they observed Plaintiff's vehicle parked outside what they believed to be his trailer. Defendants Thies and McGuire requested assistance from other law enforcement officers at that point but did not obtain a warrant. It was about 8:40 to 9:00

p.m. when the Defendants assembled outside Plaintiff's trailer. (Thies Dep. at 25, 28; McGuire Dep. at 44.)

The parties disagree as to the number of officers who responded to the scene and some aspects of the manner in which they responded. It is not disputed, however, that Defendant Garduno was one of the officers who responded to the request for assistance and that Defendants Thies and McGuire briefed Defendant Garduno and other officers of their investigation and the location of Plaintiff's trailer and car. It is also not disputed that Defendant Garduno, in turn, instructed the other officers, including Defendants Thies and McGuire, on the manner in which Plaintiff would be contacted and the area would be secured.

Before making contact with Plaintiff, some of the officers blocked Plaintiff's driveway with police cars and surrounded his trailer with firearms drawn. Defendants McGuire and Garduno approached the door of Plaintiff's trailer with guns drawn. Defendant Garduno then knocked on Plaintiff's door.

According to Defendant Garduno's deposition testimony, no loudspeakers were used to announce the presence of APD to Plaintiff or others in the area. Defendant Garduno testified that he identified himself and that it was "standard" to knock on the door and say "This is the Albuquerque Police Department. Come to the door." (Garduno Dep. at 17.)

According to Plaintiff's deposition testimony, he was inside his trailer ironing his curtains and listening to Christmas music when he heard the knock on his door, which he described as a hitting or pounding that scared and startled him. He then said, "who in the

-6-

heck is pounding on my door like that," or something to that effect, and came to the door. He pushed the door open with his left hand. When he did so, police officers on each side of the steps to his trailer grabbed him by the wrists while he was at the threshold of the door and pulled him out onto the grass in front of the trailer. The first time he heard the officers say "Albuquerque Police Department" was when he was down on the grass in front of the trailer. (Hatheway Dep. at 34-35, 39-41.)

According to the deposition testimony of Defendants Garduno and McGuire, Plaintiff opened the door rapidly and stepped completely out of the trailer onto the ground in a quick movement. He appeared agitated. With their guns drawn on him, one or both of the officers identified themselves as members of APD and told Plaintiff to place his hands on his head and step backwards toward them. Plaintiff complied, and Defendant McGuire placed him in handcuffs. Defendant McGuire patted down Plaintiff and found no weapons on him. (McGuire Dep. at 33-34; Garduno Dep. at 10-14.)

Defendant McGuire spoke to Plaintiff briefly and the officers performed a "protective sweep" of the trailer. The parties disagree as to the exact words that were spoken between Plaintiff and Defendants at that time and the purpose of the protective sweep of Plaintiff's trailer. It is not disputed, however, that no weapons or other individuals were found in Plaintiff's trailer as a result of the protective sweep and that Plaintiff was either asked or ordered to go to the police substation for questioning. At some point, Plaintiff's vehicle and his keys to the vehicle were seized by Defendants.

At about 9:15 to 9:30 p.m., Plaintiff was transported in handcuffs by police car to the APD North Valley substation for interrogation. (Thies Dep. at 46; McGuire Dep. at 36, 45-46.) Defendant Thies interrogated Plaintiff at the substation for about five hours while Defendant McGuire listened and taped the interrogation. According to Defendant Thies's deposition testimony, he read Plaintiff his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and had Plaintiff sign a waiver form about ten minutes into the interrogation, after Plaintiff allegedly stated that he was at the "Walgreens" store next to the restaurant on the date of the robbery. (Thies Dep. at 47, 66.) Defendant Thies also testified that Plaintiff was not free to leave after he read Plaintiff his <u>Miranda</u> rights. (<u>Id.</u> at 69.)

The waiver form signed by Plaintiff, as well as portions of the transcript of the interrogation, are part of the record. The parties disagree, however, about whether Plaintiff voluntarily consented to the interrogation.

The transcript indicates that an APD officer told Plaintiff: "I cannot talk to you until you sign that" (referring to the waiver form) and that Plaintiff in fact read and signed the form. (Tr. at 12.) The transcript also indicates that while reading the form, Plaintiff stated that "well, actually you're kind of pressuring me" and that he "should be let go to go home." (Tr. at 12-13.) Later in the interrogation, the officer stated: "I guess you're being held for questioning. I read you your rights." (<u>Id.</u> at 55.) In addition, the APD officer used some aggressive language during the interrogation, such as telling Plaintiff to "shut up" and telling him: "Anything you have to say to me, until it's the truth, is shit. You understand me." (<u>Id.</u> at 86-87.)

After the five-hour interrogation, Plaintiff was allowed to go home. His vehicle was subsequently returned to him. He was never charged with any crime.

## II.   ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). A fact is "material" if it might affect the outcome of the case. See id. at 248. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See id. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all

reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

The same standards apply when parties file cross-motions for summary judgment or motions for partial summary judgment. See Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir. 2001) (cross-motions); Boyd v. Cinmar of Gloucester, Inc., 919 F. Supp. 208, 208-09 (E.D. Va. 1996) (motions for partial summary judgment). Each motion is evaluated on its own merits, and a cross-motion should be treated separately from a response to an opposing party's motion. See Administrative Order 92-88 (Separate Submissions and Docketing of Motions and Responsive Pleadings) (D.N.M. May 4, 1992). Thus, the filing of cross-motions does not necessarily mean that the matter can be resolved by a summary judgment, nor does the denial of one party's cross-motion necessarily mean that the other party's cross-motion will be granted. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

When a defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct. See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001). If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity. See id. at 1156. If the plaintiff does establish the violation of a clearly established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no

genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See id.

## B.  **Plaintiff's Motion to Strike**

Plaintiff contends that Defendant's cross-motion for partial summary judgment should be stricken because the memorandum in support of Defendants' cross-motion was combined in the same document with Defendant's response in opposition to Plaintiff's motion for partial summary judgment.  Because these two items were combined in one document, Plaintiff contends that Defendant's cross-motion violates the local rule that requires movants to serve supporting briefs in support of opposed motions.  See D.N.M. LR-Civ. 7.3(b)(3). Plaintiff also contends that Defendants' alleged failure to file a separate brief in support of their cross-motion constitutes consent to deny the cross-motion pursuant to D.N.M. LR-Civ. 7.5(b).

Although there are legitimate procedural reasons for requiring the filing of separate documents addressing each motion,[1] in this context, these procedural concerns are outweighed by Defendants' right to have the Court determine whether they are entitled to

---

[1]In Administrative Order 92-88 (D.N.M. May 4, 1992), the Court ordered practitioners to submit a separate pleading for each matter upon which adjudication or ruling of the Court is sought.  This order was based upon a finding that "the filing of multiple-purpose or compound pleadings, being pleadings that raise several matters for adjudication in a single document, presents difficulties as regards the automated tracking of such pleadings."  Further, there are circumstances in which noncompliance with the Court's procedural rules and case-management orders can result in serious sanctions.  For example, Fed. R. Civ. P. 16(f) authorizes sanctions for failure to comply with the Court's scheduling or pretrial orders, and this authority includes the power to deny a defendant's summary-judgment motion—even when based on qualified immunity—when such motion is filed after the deadline for filing dispositive motions specified in a case-management order.  See Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315-316 (1st Cir. 1998). In addition, Fed. R. Civ. P. 56(c) requires summary-judgment motions to be served at least ten days before the hearing date, and "noncompliance with the time requirements of Rule 56(c) deprives the court of authority to grant a motion for summary judgment unless the opposing party has waived this requirement."  Osbakken v. Venable, 931 F.2d 36, 37 (10th Cir. 1991).

qualified immunity as early in the proceedings as possible.  See Saucier v. Katz, 533 U.S.

194, 200-01 (2001) ("Where the defendant seeks qualified immunity, a ruling on that issue

should be made early in the proceedings so that the costs and expenses of trial are avoided

where the defense is dispositive."); cf. D.N.M. LR-Civ. 1.7 ("These rules may be waived by

a Judge to avoid injustice.").  Thus, the Court denies Plaintiff's motion to strike in this

instance.

### C.    Plaintiff's Civil-Rights Claims

Section 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.  Governmental entities and government officials in their official capacity

are subject to suit under Section 1983 only if the challenged actions were taken pursuant to

an established institutional policy or custom, or by an official with final policy-making

authority.  See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999).  A

supervisory official's liability for the actions of a third party or coworker under Section 1983

must be predicated upon that supervisory official's deliberate participation or conscious

acquiescence in the deprivation of constitutional rights; mere negligence in supervising the

third party or coworker is not enough.  See id. at 1250.

Further, persons sued in their individual capacity generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

In this case, the constitutional right at issue is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When, as here, a defense of qualified immunity is raised in the context of the Fourth Amendment, the Court applies two distinct standards of reasonableness. First, in determining whether a defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment. Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier, 533 U.S. at 203-204.

For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has divided interactions between police and citizens into three categories: consensual encounters, investigative stops, and arrests. See Oliver, 209 F.3d at 1186. A consensual encounter occurs when a police officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and end the encounter. Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Id.

An investigative stop occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'" Id. (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements in order to be considered "reasonable" under the Fourth Amendment. First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out" in this context, United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'" Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363

(10th Cir. 1984)). Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause. "'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" Id. (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

In his motion for partial summary judgment, Plaintiff contends that Defendants Thies, McGuire, and Garduno violated his Fourth Amendment rights by unlawfully arresting and detaining him on the evening of December 11, 1999. In their response to Plaintiff's motion and in their cross-motion for partial summary judgment, Defendants characterize the events of that evening as a lawful investigative detention followed by a consensual encounter.

### 1.    The Events at Plaintiff's Trailer

Applying the above categories, the Court concludes that the events at Plaintiff's trailer on the evening of December 11, 1999, began as a consensual encounter, but quickly escalated to an investigative detention and a full arrest. These events began as a consensual encounter because in general officers "may lawfully go to a person's home to interview him." United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990); see 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §2.3(b), at 475 (3d ed. 1996) ("It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business."). But cf. Rogers v. Pendleton, 249 F.3d 279, 288-90 (4th Cir. 2001) (concluding that it is unreasonable for

officers to intrude upon the curtilage of a home without probable cause when the homeowner expresses contrary orders by asking the officers to leave).

Further, when a person voluntarily enters the threshold of his doorway, such that he is open to public view, he is "in a place sufficiently public that he ha[s] no legitimate expectation of privacy." McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir. 1996) (citing United States v. Santana, 427 U.S. 38 (1976)). Thus, doorway arrests are not necessarily subject to the requirements of a warrant or exigent circumstances that usually apply when police officers intrude upon the private areas of a person's home or coerce a person to leave those areas in order to carry out an arrest. See id.

In this instance, Plaintiff contends that he was coerced into leaving his home in a manner analogous to the defendant in United States v. Maez, 872 F.2d 1444 (10th Cir. 1989). In that case, "a number of armed officers and a SWAT team, having no warrant for an arrest, surrounded a mobile home occupied by [the defendant], his wife and children, and over loudspeakers asked the occupants to remove themselves from the home, which they did." Id. at 1446. The Tenth Circuit reasoned that the Fourth Amendment was violated in that situation because the show of force that the Government used to coerce the defendant to exit his home effectively invaded the privacy of the home to the same extent as a physical intrusion. See id. at 1451.

The Court concludes that the events at Plaintiff's home are distinguishable from Maez and are more analogous to the facts in McKinnon. In McKinnon, 103 F.3d at 935, the Tenth Circuit upheld a warrantless arrest of a rape suspect in the threshold of his doorway after

officers "knocked, identified themselves, and [the suspect] opened the door." This case bears more resemblance to <u>McKinnon</u> than to <u>Maez</u> because, according to Plaintiff's own deposition testimony, the curtilage in front of his trailer was an area open to public view, and the APD officers who entered that curtilage did not order him to come to the threshold of his doorway by means of loudspeakers and a coercive show of force. Rather, Plaintiff testified that he simply opened the door and entered the threshold of the doorway in response to hearing a knock. (Hatheway Dep. at 34-41.) The parties presented no evidence that Plaintiff noticed any of the officers, weapons, or vehicles that were assembled outside his trailer until he opened his door and entered the threshold of his doorway.

The fact that Defendants may have intended a show of force, or that Plaintiff was startled or scared by the hitting or pounding on his door, does not change this conclusion because "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." <u>United States v. Sanchez</u>, 89 F.3d 715, 718 (10th Cir. 1996). Rather, the standard is whether "a reasonable person would have believed he had to come out of the home and submit to the show of authority" under these circumstances. <u>Maez</u>, 872 F.2d at 1450. A loud knocking or pounding on the door, without more, is not sufficient to warrant such a belief. Even if the knocking alone was sufficient, Defendants reasonably, but mistakenly, believed that they could detain Plaintiff at the threshold of his doorway because the precise contours of the right at issue in <u>McKinnon</u> and <u>Maez</u> was not clearly established on the evening of December 11, 1999. <u>See</u> <u>Saucier</u>, 533 U.S. at 205.

Once Plaintiff opened his door and entered the threshold of his doorway, the situation became an investigative stop. See Oliver, 209 F.3d at 1186. An investigative stop at that time and location was justified at its inception because, based on the totality of the circumstances, Defendants Thies, McGuire, and Garduno had a reasonable suspicion that Plaintiff's vehicle was somehow involved in the robbery at the restaurant earlier that day. See id. at 1187-88.

In particular, Defendants Thies and McGuire had reviewed witness statements which identified the license plate of Plaintiff's vehicle as belonging to the getaway car in the robbery. While Plaintiff's physical characteristics may not have matched the videotape or the descriptions of the robber given by the witnesses, Defendants Thies and McGuire nevertheless had reason to suspect Plaintiff's involvement in the robbery based on the license-plate identification, the witness's recollection that the robber said he had friends in the car, and the proximity of Plaintiff's vehicle and trailer to the scene of the crime. In addition, Defendant Thies and McGuire may have considered their interview of Plaintiff's daughter in which she allegedly stated that Plaintiff "hangs around with a bunch of knuckleheads" who would borrow his car and that it "wouldn't surprise" her if those individuals committed a robbery. At that point, Defendants Thies and McGuire had no reason to doubt the veracity of Plaintiff's daughter, nor did they have the benefit of observing all of the relevant conduct alleged in the witness statements inasmuch as the getaway car was not depicted in the videotape of the robbery and the videotape was "not a real good picture." (Thies Dep. at 21.) Cf. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1258 (10th Cir. 1998)

(suggesting that officers ordinarily may rely on information from a witness who it seems reasonable to believe is telling the truth, except when they have the benefit of observing the very conduct which they know served as the basis for the witness's allegations).

Defendants Thies and McGuire briefed Defendant Garduno on their investigation before Defendant Garduno gave his instructions regarding the manner in which Plaintiff would be detained and the premises would be secured. Defendant Garduno was entitled to rely upon the briefing he received from Defendants Thies and McGuire in determining whether there was reasonable suspicion to justify an investigative detention, and such reliance was objectively reasonable under the circumstances. See Oliver, 209 F.3d at 1190-91.

Further, an investigative detention based on reasonable suspicion does not necessarily preclude the use of certain security measures when there are objective, reasonable concerns about officer safety. See, e.g., Holt, 264 F.3d at 1223 (concluding that in light of an officer's "objective, reasonable basis to fear for his or her life every time a motorist is stopped," officers conducting routine traffic stops may order the driver and passengers to get out of the vehicle and to raise their hands during the stop); United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an investigatory stop by grabbing a suspect by the

arm and placing him face down on the pavement). While Plaintiff has a greater expectation of privacy in his home than in his vehicle, compare Payton v. New York, 445 U.S. 573, 585-89 (1980), with California v. Carney, 471 U.S. 386, 390-93 (1985), in this case Plaintiff was in public view at the threshold of his doorway, and Defendants Thies, McGuire, and Garduno had an objective reason to be concerned about their safety because the witness statement indicated that the robber said he had a gun and had friends in the car, see Perdue, 8 F.3d at 1463.

To the extent that the show of force used by these Defendants at Plaintiff's trailer exceeded the proper scope of an investigative stop, such an error as to the degree of force they were permitted to use in effecting the stop under these circumstances was a reasonable mistake in light of legitimate officer-safety concerns and the "sometimes 'hazy border between excessive and acceptable force.'" Saucier, 533 U.S. at 205. "The concern of the [qualified] immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 205. Here, this concern weighs in favor of granting qualified immunity to Defendants Thies, McGuire, and Garduno regarding Plaintiff's civil-rights claims arising from the events that transpired at his trailer on the evening of December 11, 1999.

### 2. The Events at the North Valley Substation

After Plaintiff was detained outside his trailer, he was handcuffed, placed in the back seat of a police car, and taken to APD's North Valley Substation for five hours of custodial interrogation by Defendants Thies and McGuire. While there may be

circumstances in which a suspect may be moved to another location for a brief period without exceeding the permissible scope or duration of an investigatory stop, see generally 2 Wayne R. LaFave, Search and Seizure, supra, § 9.2(g), it is clearly established that the permissible scope and duration of an investigative stop does not include transporting a suspect to a police station for five hours of custodial interrogation, see Dunaway v. New York, 442 U.S. 200, 211-16 (1979); United States v. Gonzalez, 763 F.2d 1127, 1133 (10th Cir. 1985). Thus, within a few minutes after Plaintiff arrived at the substation, Defendants Thies and McGuire had clearly exceeded the permissible scope and duration of an investigative stop, and their actions required further justification.

In particular, the continued detention of Plaintiff at the substation must be supported by a showing that these Defendants had probable cause to arrest Plaintiff, or that Plaintiff voluntarily consented to stay and answer questions at the substation for five hours. Defendants Thies and McGuire do not assert that they had probable cause to arrest Plaintiff at any point during their investigation, and the facts allegedly known by these Defendants at the time of their interrogation at the substation did not amount to probable cause. See United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994). The requirement of probable cause was clearly established in this context on or about December 11, 1999, see Dunaway, 442 U.S. at 211-16, Gonzalez, 763 F.2d at 1133, and a reasonable officer under the circumstances would not have mistakenly believed that probable cause existed, see Baptiste, 147 F.3d at 1259-60.

While a determination of probable cause is to be based upon the totality of the circumstances, questions regarding the veracity, reliability, and basis of knowledge of witnesses remain "highly relevant." <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983). Further, while the veracity of crime victims or crime-scene bystanders ordinarily is assumed, <u>see</u> <u>United States v. Blount</u>, 123 F.3d 831, 835 (5th Cir. 1997) (en banc), in this case the Defendants had reason to question the reliability of the two witness statements inasmuch as the descriptions of the robber given therein did not match with regard to height, weight, build, apparent age, complexion, or hair color.

As to the bases of the witnesses' knowledge, it is noteworthy that the observations recorded in the first witness statement were made from behind the counter within the restaurant, while the observations recorded in the second witness statement were made from the parking lot outside the restaurant. The witness statements do not indicate that either witness observed both the robbery inside the restaurant and the use of the alleged getaway vehicle in the parking lot. Combined with the inconsistencies in the descriptions of the alleged robber, these questions regarding the bases of the witnesses' knowledge raise significant doubts about whether each witness observed the same person or whether the events that each witness observed were in fact connected.

Another relevant consideration regarding the probable-cause inquiry is whether officers have made a reasonable effort to "'interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention.'" <u>Baptiste</u>, 147 F.3d at 1259

(quoting <u>Romero</u>, 45 F.3d at 1476-77). In this case, Defendants Thies and McGuire had the opportunity to confirm or dispel some of their suspicions about Plaintiff's resemblance to the robber and his possible involvement in the robbery within a short time after Plaintiff arrived at the substation. For example, they could have readily observed whether Plaintiff had the tattoo on his hand or other specific physical characteristics that were consistently identified in the witness statements. In addition, these Defendants had access to whatever information was lawfully gleaned from the protective sweep of Plaintiff's trailer and the seizure of his vehicle. While Defendants Thies and McGuire were entitled to weigh the credibility of Plaintiff's statements in making a determination of probable cause, <u>see id.</u> at 1259, the fact remains that they found no additional evidence to implicate Plaintiff in any crime. Plaintiff's alleged statement that he was at a store next to the restaurant on the date of the robbery is consistent with innocent behavior and does not establish probable cause. <u>See id.</u> at 1260 n.12.

Plaintiff's continued detention at the substation also cannot be justified on the basis of voluntary consent. Even assuming Defendants are correct in asserting that Plaintiff verbally indicated a willingness to go to the substation while handcuffed and placed in the police car outside his trailer, it is obvious that a reasonable person who is "handcuffed and strapped into an officer's car . . . would not have felt free to terminate the encounter and leave." <u>Melendez-Garcia</u>, 28 F.3d at 1053; <u>cf. Sanchez</u>, 89 F.3d at 718 ("The subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis.").

Generally, an arrest has occurred when there has been a show of official authority that would cause a reasonable person to believe he was not free to leave. See Florida v. Royer, 460 U.S. 491, 502 (1983) (plurality opinion); accord Maez, 872 F.2d at 1450.

> Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

Sanchez, 89 F.3d at 718. Even when the evidence is viewed in the light most favorable to Defendants and Plaintiff bears the burden of proving that his consent was not voluntary, it cannot be disputed that most, if not all, of the above factors were present in this case from the time Plaintiff stepped out of his trailer until he was released several hours later. Thus, the situation during that period is not accurately characterized as a consensual encounter.

Determining the voluntariness of Plaintiff's alleged consent to the seizure of his person depends on whether there is "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given," and whether "this consent was given without implied or express duress or coercion." Sanchez, 89 F.3d at 719 (internal quotations omitted). In addition, when an allegedly voluntary consent is preceded by a Fourth Amendment violation, the Court must consider whether there exists "'a break in the causal connection between the illegality'" and the evidence thereby obtained. Melendez-Garcia, 28 F.3d at 1054 (quoting United States v. Recalde, 761 F.2d 1448, 1458 (10th Cir.

1985)). To determine whether such a break occurred, the Court looks at the totality of the circumstances, with special attention to the following factors: "1) the temporal proximity between the police illegality and the consent . . . ; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." Id. at 1054 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The evidence submitted by the parties in this case, when viewed in the light most favorable to Defendants, does not show that Plaintiff's alleged consent to the continued detention at the substation for five hours "was unequivocal and specific and freely and intelligently given" or that "'this [alleged] consent was given without implied or express duress or coercion." Sanchez, 89 F.3d at 719. Rather, the record indicates that Defendants Thies and McGuire were detaining Plaintiff for custodial interrogation and that he was not free to leave the substation during that period.

Defendants cannot rely on Plaintiff's alleged signing of the waiver form approximately ten to fifteen minutes after he arrived at the substation in order to justify the additional detention at that point. The waiver form did not mention that Plaintiff was free to leave or that he had a right under the Fourth Amendment to be free from the unreasonable seizure of his person. Rather, the form only referred to Plaintiff's Fifth Amendment right to remain silent and seek the advice of counsel in response to "questioning initiated by law enforcement officers *after* [he] [was] . . . taken into custody." Miranda, 384 U.S. at 444 (emphasis added). The necessity of advising Plaintiff of his Fifth Amendment rights under Miranda is premised on the fact that he already had been taken into custody, see id., and this

premise is inconsistent with Defendants' later assertion that Plaintiff was remaining at the substation voluntarily.

Moreover, the evidence submitted by the parties, when viewed in the light most favorable to Defendants, does not show a break in the causal connection between the unlawful arrest of Plaintiff and his signature on the waiver form. The request for Plaintiff's signature on the waiver form occurred within minutes of his unlawful arrest at the substation, and there were few if any intervening circumstances to suggest that the interrogation had become a consensual encounter at that point. While it is not disputed that Defendants read Plaintiff his Miranda rights, removed the handcuffs from Plaintiff's wrists, and no longer had their weapons drawn while Plaintiff was at the substation, the evidence also indicates that Plaintiff's personal effects (such as his car key and vehicle) had not been returned to him so as to allow him a convenient means of leaving the substation that night. Rather, he remained confined in a non-public interrogation room and was not even allowed to go to the bathroom without an officer escorting him. These facts do not show a lack of temporal proximity or the presence of significant intervening circumstances between the unlawful arrest and the alleged consent. See Sanchez, 89 F.3d at 718; Melendez-Garcia, 28 F.3d at 1054.

Further, the continued detention was clearly purposeful. Defendants Thies and McGuire did not transport Plaintiff to the substation for some brief investigatory purpose such as fingerprinting, photographing, or participation in a line-up. Rather, these Defendants "purposefully embarked on what was legally nothing more than a fishing expedition" at that

point, see United States v. Sandoval, 29 F.3d 537, 544 (10th Cir. 1994), "'in the hope that something might turn up.'" Brown, 422 U.S. at 605.

For these reasons, the Court concludes that Plaintiff's continued detention at the substation cannot be justified on the grounds of voluntary consent. The Court further concludes that the legal requirements for establishing the voluntariness of a person's consent to continued detention under these circumstances were clearly established on December 11, 1999, and that the situation at the substation on that date is not one in which an officer could have reasonably but mistakenly believed that Plaintiff's alleged consent was voluntary. See Saucier, 533 U.S. at 206. Therefore, Defendants Thies and McGuire are not entitled to qualified immunity with regard to Plaintiff's civil-rights claims arising from his custodial interrogation at the police substation, and Plaintiff is entitled to summary judgment as to the liability of Defendants Thies and McGuire regarding these claims.

### D.    Plaintiff's Tort Claims

The liability of APD and its employees for statutory or common-law torts is limited by the New Mexico Tort Claims Act (NMTCA), N.M. Stat. Ann. §§ 41-4-1 to 41-4-29 (Michie 1978 & Supp. 2001). Section 41-4-4(A) of the NMTCA grants governmental immunity from liability for any tort to governmental entities and public employees acting within the scope of their duties except as waived by Sections 41-4-5 to 41-4-12 of the NMTCA. The waiver of immunity applicable to "law enforcement officers while acting within the scope of their duties" contained in Section 41-4-12 is limited to

liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico.

In addition to the civil-rights claims discussed above, Plaintiff's amended complaint alleges that the individual Defendants committed intentional torts of assault, battery, false arrest, false imprisonment, and trespass, and that Defendant City of Albuquerque "is vicariously liable for the intentional torts of the individual Defendants." (Am. Comp. ¶¶ 36, 38.) Plaintiff has moved for summary judgment as to his claims of false arrest and false imprisonment against Defendants Thies, McGuire, and Garduno. Defendants' cross-motion seeks summary judgment as to all of Plaintiff's tort claims against these Defendants.

It follows from the above analysis of Plaintiff's civil-rights claims that Plaintiff is entitled to summary judgment on his false arrest and false imprisonment claims against Defendants Thies and McGuire arising from his detention at the substation, while Defendants Thies, McGuire, and Garduno are entitled to summary judgment as to Plaintiff's claims of assault, battery, trespass, false arrest, and false imprisonment arising from the events at Plaintiff's trailer.

New Mexico does not have uniform civil jury instructions for the torts of assault, battery, trespass, false arrest, or false imprisonment. See, e.g., NMUJI 13-1624 cmt. (Michie 2002) (noting committee's conclusion that "there was insufficient New Mexico law on assault and battery to guide the committee on this subject"). Thus, the Court relies on

published opinions of the State's appellate courts and analogous statutory offenses to define the elements of these torts and any relevant defenses.

### 1. False Arrest and Imprisonment

"Under New Mexico law, '[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" Romero v. Sanchez, 119 N.M. 690, 693, 895 P.2d 212, 215 (1995) (quoting N.M. Stat. Ann. § 30-4-3 (Michie 1994)); see also Mendoza v. K-Mart, Inc., 587 F.2d 1052, 1058 (10th Cir. 1978) ("One basic element of . . . a [false imprisonment] claim is that the plaintiff be confined or restrained in some unlawful way by the defendant."). Unlawful arrest or detention has "similar requirements." Romero, 119 N.M. at 693, 895 P.2d at 215. "[A] common-law defense to a civil wrongful arrest or a false imprisonment suit . . . requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." State v. Johnson, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54 (1996).

In this case, the evidence submitted by Plaintiff does not establish all the required elements of a claim for false arrest or false imprisonment during the period in which he was confined or restrained in the area outside his trailer because such confinement or restraint was not unlawful at that time. Once Defendants Thies and McGuire exceeded the lawful scope and duration of an investigative detention by confining or restraining Plaintiff at the substation for five hours of custodial interrogation, however, the undisputed facts viewed in the light most favorable to Defendants are sufficient to establish the elements of Plaintiff's

claims for false arrest and false imprisonment, and Defendants Thies and McGuire have established no defense to these claims inasmuch as the confinement or restraint at that point was not supported by voluntary consent or probable cause.  See id.

## 2. **Assault and Battery**

Under New Mexico law, battery involves "the unlawful, intentional touching or application of force to the person of another," N.M.Stat. Ann. § 30-3-4 (Miche 1978), and "[a]n assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" Romero, 119 N.M. at 693, 895 P.2d at 215 (quoting N.M. Stat. Ann. 30-3-1(B) (Michie 1994)); see also Baca v. Velez, 114 N.M. 13, 15, 833 P.2d 1194, 1196 (Ct. App. 1992).  A common element of assault and battery is an intent "'to engage in unlawful conduct that invades the protected interests of others.'" Caillouette v. Hercules, Inc., 113 N.M. 492, 496-97, 827 P.2d 1306, 1310-11 (Ct. App. 1992) (quoting California First Bank v. State of N.M., 111 N.M. 64, 74 n.6, 801 P.2d 646, 656 n.6 (1990)).

Inasmuch as the conduct of Defendants Thies, McGuire, and Garduno at Plaintiff's trailer on the evening of December 11, 1999 was not unlawful, there is no basis for holding them liable for the torts of assault or battery.  Cf. Mead v. Connor, 66 N.M. 170, 173, 344 P.2d 478, 479-80 (1959) ("Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace.").  Further, Plaintiff has not submitted evidence that Plaintiff was subjected to a battery or a threat of same while at the substation.  See Romero, 119 N.M. at 693, 895 P.2d at 215 ("Fear of arrest is not

equivalent to fear of an imminent battery."). For these reasons, Defendants Thies, McGuire, and Garduno are entitled to summary judgment on Plaintiff's assault and battery claims.

### 3. Trespass

A trespass on land "consists of an unauthorized entry upon the land of another" and can form the basis for liability under Section 41-4-12 of the NMTCA. Montes v. Gallegos, 812 F. Supp. 1165, 1170 (D.N.M. 1992) (citing North v. Pub. Serv. Co., 94 N.M. 246, 608 P.2d 1128 (Ct. App. 1980)). In New Mexico, "[c]riminal trespass consists of unlawfully entering or remaining upon posted private property without possessing written permission from the owner or person in control of the land," or "unlawfully entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof." N.M. Stat. Ann. § 30-14-1(A) and (B) (Michie 1978 & Supp. 2001); see also id. § 30-14-1.1(A) ("Any person who enters and remains on the lands of another after having been requested to leave is guilty of a misdemeanor."); NMUJI 13-1301 (Michie 2002) (defining a "trespasser" as "a person who enters or remains upon the premises of another without the [express] [or] [implied] permission of the [owner] [occupant] of the premises") (brackets in original). A criminal trespasser "shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed" by the trespasser. Id. § 30-14-1(D); accord id. § 30-14-1.1(D).

In this instance, Plaintiff presented no evidence that his property was posted with "no trespassing" signs, that he asked Defendants Thies, McGuire, or Garduno to leave, or that

these Defendants knew that consent to enter or remain on Plaintiff's property had been denied or withdrawn by Plaintiff when they initially entered his curtilage to knock on his door. While Plaintiff was in no position to ask the officers to leave or withdraw his consent once he was detained outside his trailer, it follows from the above analysis of Plaintiff's civil-rights claims that Defendants Thies, McGuire, and Garduno were authorized to secure the area encompassing Plaintiff's property in the interest of officer safety while conducting their investigative detention during that period. Thus, Defendants are entitled to summary judgment regarding Plaintiff's claim for trespass on land.

The tort of trespass also encompasses trespass to chattels. See Restatement (Second) of Torts § 217 (1965), Texas-New Mexico Pipeline Co. v. Allstate Constr., Inc., 70 N.M. 15, 17, 369 P.2d 401, 402 (1962) ("Trespass to personalty is the intentional use or interference with a chattel which is in the possession of another, without justification."). "One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if . . . he dispossesses the other of the chattel," Restatement, supra § 218, and a "dispossession may be committed by [among other things] intentionally . . . taking the chattel into the custody of the law." Id. § 221(e).

In this case, however, Plaintiff did not specifically address his claim of trespass to chattels in his brief in opposition to Defendants' cross-motion for summary judgment, nor did Plaintiff identify what evidence supports the essential elements of this claim. Accordingly, Defendant is entitled to summary judgment as to this claim as well. See Celotex Corp., 477 U.S. at 322-23.

## III.    CONCLUSION

For the foregoing reasons, the parties' cross-motions for partial summary judgment are granted in part and denied in part, and Plaintiff's Motion to Strike Defendant's Cross-Motion for Summary Judgment is denied.

**IT IS, THEREFORE, ORDERED** that with respect to the liability of Defendants Thies and McGuire under 42 U.S.C. § 1983 arising from the violation of Plaintiff's Fourth Amendment rights during his detention at the APD substation and the liability of Defendants Thies and McGuire under N.M. Stat. Ann. § 41-4-12 arising from the commission of the torts of false arrest and false imprisonment at the APD substation, Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and Defendants' Cross-Motion for Partial Summary Judgment is **DENIED IN PART**.

**IT IS FURTHER ORDERED** that with respect to all of Plaintiff's claims against Defendants Thies, McGuire, and Garduno arising from the events at his home, including those based on 42 U.S.C. § 1983 and the torts of assault, battery, false arrest, false imprisonment, and trespass, Defendants' Cross-Motion for Partial Summary Judgment is **GRANTED IN PART** and Plaintiff's Motion for Partial Summary Judgment is **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendants' Cross-Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's answer to Plaintiff's Amended Complaint shall be filed within fourteen (14) calendar days after this Memorandum Opinion and Order is entered, and the parties are granted leave to file additional dispositive motions in this matter within thirty (30) days after this Memorandum Opinion and Order is entered.

**M. CHRISTINA ARMIJO**
United States District Judge